## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL COOPER, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> GTX, INC., ROBERT J. WILLS, MARC S. HANOVER, J.R. HYDE, III, J. KENNETH GLASS, MICHAEL G. CARTER, KENNETH S. ROBINSON, and GARRY A. NEIL, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Michael Cooper ("Plaintiff"), through his undersigned counsel, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.  This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of GTx, Inc. ("GTx" or the "Company") (other than Defendants outlined below) against the Company and its Board of Directors (the "Board" or "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") in connection with the proposed merger between GTx and Oncternal Therapeutics, Inc. ("Oncternal").

2.  On March 6, 2019, the Board approved the terms of and caused the Company to enter into an agreement and plan of merger, which was subsequently amended on April 30, 2019 (the "Merger Agreement"), pursuant to which Grizzly Merger Sub, Inc., a wholly-owned subsidiary of GTx ("Merger Sub"), will merge with and into Oncternal, with Oncternal surviving

as a wholly-owned subsidiary of GTx (the "Proposed Transaction"). While the Proposed Transaction will technically result in the acquisition of Oncternal by GTx, in reality it is a takeover of GTx by Oncternal. That is because, pursuant to the terms of the Merger Agreement, at the time of the consummation, each share of Oncternal common stock will be converted into the right to receive approximately 0.5137 shares of GTx's common stock (the "Merger Consideration") such that, at the conclusion of the Proposed Transaction, the former stockholders of Oncternal will hold approximately 77.5% of the outstanding shares of common stock of the combined company, while GTx's current stockholders will retain a mere 22.5% of the outstanding shares of common stock of the combined company.

3.     In order to convince GTx's stockholders to vote in favor of the Proposed Transaction, on or about May 6, 2019, the Board authorized the filing of a materially incomplete and false and/or misleading Form S-4 Registration Statement (the "Proxy") (which is incorporated herein by reference) with the Securities and Exchange Commission ("SEC"), which contains, in violation of Sections 14(a) and 20(a) of the Exchange Act, incomplete and materially misleading information regarding: (a) the financial projections for GTx and Oncternal; (b) the process that resulted in the Proposed Transaction; and (c) potential conflicts of interest affecting certain members of the Board. As outlined in further detail below, the Proxy contains woefully inadequate disclosure regarding the financial prospects of both GTx on a standalone basis and the *pro forma* combined company and the concurrent future employment communications that members of the Edge Board and management had during the negotiations that resulted in the Merger Agreement. These nondisclosures are all the more egregious in light of the fact that the Board entered into the Merger Agreement barely six months after the Company's stock price plummeted by more than 90% (as outlined below).

4.   For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to GTx stockholders in advance of the special meeting of the Company's stockholders or, in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

5.   This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

6.   Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

7.   Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. More specifically, GTx's common stock is listed and traded on the Nasdaq Capital Market, which is headquartered in this District. *See, e.g., United States v.*

*Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

8.      Plaintiff is, and at all relevant times has been, a GTx shareholder.

9.      Defendant GTx is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 17 W Pontotoc Ave., Suite 100, Memphis, Tennessee 38103.

10.     Defendant Robert J. Wills ("Wills") is, and has been at all relevant times, a director of the Company, and has served as Chairman of the Board since March 2015.

11.     Defendant Marc S. Hanover ("Hanover") is, and has been at all relevant times, a director of the Company, and currently serves as the Company's co-founder and Chief Executive Officer ("CEO").

12.     Defendant J.R. Hyde, III ("Hyde") is, and has been at all relevant times, a director of the Company. In conjunction with Mr. Wills' appointment as Chairman of the Board effective March 2015, Mr. Hyde was appointed as the Board's Lead Director. Previously, Mr. Hyde served as Chairman of the Board from November 2000 through February 2015.

13.     Defendant J. Kenneth Glass ("Glass") is, and has been at all relevant times, a director of the Company.

14.     Defendant Michael G. Carter ("Carter") is, and has been at all relevant times, a director of the Company.

15.     Defendant Kenneth S. Robinson ("Robinson") is, and has been at all relevant times, a director of the Company.

16.     Defendant Garry A. Neil ("Neil") is, and has been at all relevant times, a director of the Company.

17.   Defendants Wills, Hanover, Hyde, Glass, Carter, Robinson, and Neil form the Board of Directors of GTx and are collectively referred to herein as the "Board" or the "Individual Defendants." Each of the Individual Defendants at all relevant times had the power to control and direct GTx to engage in the misconduct alleged herein.

## CLASS ACTION ALLEGATIONS

18.   Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of GTx (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

19.   This action is properly maintainable as a class action because:

a.   The Class is so numerous that joinder of all members is impracticable.  As of March 12, 2019, there were approximately 24,051,844 outstanding shares of GTx common stock. The actual number of public shareholders of GTx will be ascertained through discovery;

b.   There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)   whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

ii)   whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)   whether Plaintiff and other members of the Class will suffer

irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

## I.      Relevant Corporate Background

20.      GTx is a biopharmaceutical company dedicated to the discovery, development, and commercialization of medicines to treat serious and/or significant unmet medical conditions. According to the Company's website, the following graphic represents the Company's pipeline:

## PIPELINE

**Innovative oral medicines based on hormone receptor targeting**



21.     Under an exclusive worldwide license agreement with the University of Tennessee Research Foundation ("UTRF"), GTx is developing UTRF's proprietary selective androgen receptor degrader ("SARD") technology, which, according to the Company's annual report as filed on Form 10-K on March 18, 2019, the Company believes has the potential to provide compounds that can degrade or antagonize multiple forms of androgen receptor, thereby potentially inhibiting tumor growth in patients with progressive castration-resistant prostate cancer, including those patients who do not respond to or are resistant to current androgen targeted therapies.

22.     Up until late 2018, GTx had also been developing selective androgen receptor modulators ("SARMs"). GTx's SARM product candidate, enobosarm (GTx-024), was most recently evaluated in post-menopausal women with stress urinary incontinence ("SUI"). However, as outlined below, during the third quarter of 2018, GTx announced that the ASTRID trial regarding enobosarm had failed to achieve statistical significance on the primary endpoint of

the proportion of patients with a greater than 50% reduction in incontinence episodes per day compared to placebo. Thereafter, GTx determined that there is not a sufficient path forward to warrant additional clinical development of enobosarm to treat SUI and has therefore discontinued further development of enobosarm to treat SUI, including discontinuing the related durability and open-label safety extension studies GTx initiated before it received topline data from the ASTRID trial. GTx has also discontinued any further development of its SARM program generally.

23.     Oncternal is a clinical-stage biopharmaceutical company focused on developing a diverse pipeline of product candidates for cancers with critical unmet medical need. The company's development efforts are focused on promising, yet untreated biological pathways implicated in cancer generation or progression. Oncternal's lead product is designed to inhibit receptor tyrosine kinase-like Orphan Receptor 1, which is a growth factor receptor that is widely expressed on many tumors and whose overexpression has been correlated with poor prognosis, which activates pathways that lead to increased tumor proliferation, invasiveness, and drug resistance.

## II.     Relevant Events Leading to the Merger Agreement and Proposed Transaction

24.     As noted above, in September 2017, GTx initiated a randomized, placebo-controlled Phase 2 clinical trial (the "ASTRID Trial") of its lead SARM product candidate enobosarm. However, in September 2018, data from the trial indicated that the ASTRID Trial had failed to achieve statistical significance on the trial's primary endpoint. Thereafter, after completing its review of the full data sets from the clinical trial and discussing the data with clinical experts, GTx determined that there was not a sufficient path forward to warrant additional clinical development of enobosarm to treat SUI. It therefore discontinued further

development of enobosarm to treat SUI, including discontinuing the related durability and open-label safety extension studies which were initiated before GTx received topline data from the ASTRID Trial.

25.    On September 21, 2018, GTx announced that the ASTRID Trial failed to achieve statistical significance on the primary endpoint of the proportion of patients with a greater than 50% reduction in incontinence episodes per day compared to placebo. In the wake of this news, GTx stock dropped almost 90%, from trading in the range of approximately $15 to $26 per share to trading in the range of just +/- $1.50 per share:



Importantly, though, despite this drop, GTx continued to own viable technology and other candidates for development, and the Proxy specifically notes that "GTx had sufficient cash to

undertake SARD development on its own without the need to raise additional funds until sometime in 2020."

26.     Nonetheless, at this time, members of GTx management began reaching out to third parties to discuss a potential sale of GTx's technology and/or GTx itself. Throughout the remainder of 2018, GTx communicated with a number of potential acquirers of both its technology and the Company as a whole. During these negotiations, and as noted below, GTx entered into several confidentiality agreements with potential bidders, but the Proxy fails to disclose whether those confidentiality agreements contained either standstill provisions and/or "Don't-Ask-Don't-Waive" provisions.

27.     Also during these negotiations members of management conducted discussions regarding potential future employment. For example, as early as October 2018, members of management discussed with one of the bidders (Party D) its "willingness to provide employment to several clinical and financial personnel should a transaction between Company D and GTx come to fruition." Also during these negotiations, GTx management and the Board were reportedly concerned that "any merger with a private company presented difficult corporate structuring issues for a public company and the proposals that had been suggested so far would result in significant dilution for GTx's stockholders." Finally, during these negotiations, other bidders (including Parties L and M) provided actual bids to GTx, but the Proxy does not disclose the terms of those bids.

28.     Ultimately, despite the Company's stated belief in the potential of SARD and the fact that it had the funds to develop that technology itself, on March 6, 2019, the Board caused the Company to enter into the Proposed Transaction, the consummation of which will not only lock the Company's shareholders in at a stock price that is at its *lowest trading range in GTx*

*history* but also seriously limit their opportunity to reap the rewards of GTx's growth potential. That is because, as noted above, should the Proposed Transaction be consummated, immediately following its closing, the former stockholders of Oncternal will hold approximately 77.5% of the outstanding shares of common stock of the combined company, while GTx's current stockholders will retain a mere ownership interest of approximately 22.5% of the outstanding shares of common stock of the combined company.[1]

29.     The following day, on March 7, 2019, GTx and Oncternal issued a joint press release announcing the Proposed Transaction, which stated in pertinent part:

**GTx and Oncternal Therapeutics Enter into Definitive Merger Agreement to Create Nasdaq-Listed Clinical-Stage Company Developing a Diverse Pipeline of Novel Cancer Therapies**

*— Merger will combine Oncternal's clinical stage oncology pipeline and expertise with GTx's preclinical Selective Androgen Receptor Degrader (SARD) program for castration-resistant prostate cancer*

*— Conference call to be held today at 8:30 a.m. Eastern Time/5:30 a.m. Pacific Time —*

**MEMPHIS, Tenn. and SAN DIEGO, Calif. — March 7, 2019** —  GTx, Inc. (Nasdaq: GTXI) and  Oncternal Therapeutics, Inc., a privately held clinical-stage biotechnology company developing potential first-in-class therapeutic candidates for cancers with critical unmet medical need, today jointly announced that they have entered into a definitive merger agreement under which the stockholders of Oncternal would become the majority owners of GTx's outstanding common stock. The proposed merger will create a publicly-traded, clinical-stage oncology company.

The combined company will be named Oncternal Therapeutics, Inc. and plans to change its ticker symbol on the Nasdaq Capital Market to ONCT upon closing of the transaction.

The combined company will have a strong balance sheet and deep pipeline of promising oncology drug programs advancing in development:

---

[1]     And, while the Merger Agreement does provide for a limited Contingent Value Right ("CVR") that may allow GTx stockholders to receive payments based on the grant, sale, or transfer of GTx's SARD or SARM technology, those payments are both limited in amount and duration.

- Oncternal's lead program, cirmtuzumab, is an investigational, potential first-in-class anti-ROR1 monoclonal antibody. Cirmtuzumab is currently in a Phase 1/ 2 clinical trial in combination with ibrutinib for the treatment of chronic lymphocytic leukemia (CLL) and mantle cell lymphoma (MCL). In addition, an investigator-initiated Phase 1 clinical trial of cirmtuzumab in combination with paclitaxel for women with metastatic breast cancer is being conducted at the University of California San Diego (UC San Diego).

- TK216, an investigational, potential first-in-class small molecule designed to inhibit the biological activity of ETS-family transcription factor oncoproteins, is being evaluated alone and in combination with vincristine in a Phase 1 clinical trial in patients with relapsed or refractory Ewing sarcoma.

- A ROR-1 targeted chimeric antigen receptor T-cell (CAR-T) program is in preclinical development at UC San Diego for hematologic and solid tumors.

- A Selective Androgen Receptor Degrader (SARD) program, an investigational, potential first-in-class preclinical program designed for oral administration to treat castration-resistant prostate cancer in men who are non-responsive to current androgen targeted therapies.

Cash, cash equivalents and short-term investments for the combined company are expected to be approximately $26 million, if the merger closes by the end of the second quarter of 2019. These funds are expected to be sufficient to advance Oncternal's programs into the second quarter of 2020, including the Phase 2 study of cirmtuzumab and ibrutinib, and will fund the planned SARD preclinical studies to support the submission of an investigational new drug application with the U.S. Food and Drug Administration.

James Breitmeyer, MD, PhD, cofounder, president and CEO of Oncternal and a 30-year veteran of the pharmaceutical industry, will continue as president and CEO of the combined company. David Hale, cofounder of Oncternal and a 35-year veteran of numerous successful private and public biotech companies, will continue as Chairman of the Board of the combined company.

"This merger introduces Oncternal and its promising oncology pipeline to the public market and provides additional capital resources to advance our programs to potential value inflection points," said Dr. Breitmeyer. "In addition to clinical data expected from our cirmtuzumab and TK216 programs later this year and during the first half of 2020, we also plan to have preclinical results that get us ready for clinical testing of our ROR1 CAR-T program. The addition of GTx's SARD technology strengthens our pipeline and augments our entire oncology

franchise, which includes a range of therapeutic approaches for a variety of difficult to treat cancers."

"This transaction with Oncternal reflects the continued commitment of our management team and Board of Directors to deliver value to stockholders and make a difference in patients' lives," said Robert J. Wills, PhD, Executive Chairman of GTx. "Following a thorough review of strategic alternatives, we have determined that a reverse merger with Oncternal will enable GTx investors to participate in Oncternal's broader pipeline of oncology opportunities, including product candidates designed to address rare disease indications, and enable the continued development of our first-in-class SARD technology by a company whose leadership has deep experience in developing oncology medicines."

**About the Proposed Merger**

The merger is structured as a stock-for-stock transaction whereby all of Oncternal's outstanding shares of common stock and securities convertible into or exercisable for Oncternal's common stock will be converted into GTx common stock and securities convertible into or exercisable for GTx common stock. Immediately following the closing of the transaction, the former stockholders of Oncternal will hold approximately 75% of the outstanding shares of common stock of the combined company. In addition to retaining an ownership interest representing approximately 25% of the outstanding shares of common stock of the combined company, the GTx stockholders of record as of immediately prior to the effective time of the merger will receive non-transferable contingent value rights ("CVR") entitling the holders to receive in the aggregate 50% of any net proceeds derived from the grant, sale or transfer of rights to SARD or selective androgen receptor modulator (SARM) technology during the term of the CVR and, if applicable, to receive royalties on the sale of any SARD products by the combined company during the term of the CVR. Under certain circumstances further described in the merger agreement, the exchange ratio of the outstanding shares of common stock of the combined company may be adjusted upward or downward based on cash levels of each of the companies at closing.

Upon closing of the transaction, GTx will be renamed Oncternal Therapeutics, Inc. and will be headquartered in San Diego, California under the leadership of Oncternal's current management team. Although no GTx employee is expected to remain an employee of the combined company, the merger agreement provides that the Board of Directors of the combined company will be comprised of nine members, including seven designated Oncternal directors as well as Robert J. Wills, PhD and Michael G. Carter, MD, from GTx's current Board. The combined company is expected to trade on The Nasdaq Capital Market under a new ticker symbol, ONCT. The merger agreement has been unanimously approved by the Board of Directors of each company. The transaction is expected to close in the second quarter of 2019, subject to approvals

by stockholders of each company and other customary closing conditions.

Aquilo Partners, L.P. is acting as exclusive financial advisor to GTx on the proposed transaction and Cooley LLP serves as legal counsel to GTx. Piper Jaffray is acting as exclusive financial advisor to Oncternal on the proposed transaction and Latham & Watkins, LLP serves as legal counsel to Oncternal.

Thereafter, in light of academic research received by GTx and shared with Oncternal, on April 30, 2019, the parties amended the original merger agreement (resulting in the Merger Agreement defined above), pursuant to which the original exchange ratio of 0.4474 was increased to the current exchange ratio of 0.5137, the amount of the post close company that current GTX shareholders would hold was reduced from 25% to 22.5%, and the CVR was devalued.

## III.   **The Materially Incomplete and Misleading Proxy**

30.     On May 6, 2019, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction and discloses the bases on which the Board relied to recommend and solicit votes in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

31.     *First*, the Proxy fails to disclose **any** of the financial projections for GTx or Oncternal, despite the fact that these projections were reviewed and relied upon by Company management and GTx's financial advisor, Aquilo Partners, L.P. ("Aquilo"), in assessing whether the Proposed Transaction was "fair" and in the best interests of GTx and its shareholders.

32.     More specifically, the *GTx Reasons for the Merger* section of the Proxy provides,

as the *very first* of *thirty* listed reasons for the Merger, the fact that the Board, GTx management, GTx's outside legal counsel, and Aquilo, all reviewed and assessed GTx's "business, operational and **financial prospects**…" Proxy at 141. In addition, the *Opinion of the GTX Financial Advisor* section of the Proxy discloses that Aquilo "reviewed and analyzed" the following information in reaching its conclusion that the Proposed Transaction was "fair" to GTx shareholders:

- *certain non-public information* relating to GTx that was prepared and provided to Aquilo by GTx, including certain operating and financial information relating to GTx's business, including GTx's unaudited financial statements for the year ended December 31, 2018 and ***financial and business forecasts and projections*** prepared by management of GTx relating to GTx's prospects; [and]

- *certain non-public information* relating to Oncternal that was prepared and provided to Aquilo by Oncternal, including certain operating and financial information relating to Oncternal's business, including Oncternal's unaudited financial statements for the year ended December 31, 2018 and ***financial and business forecasts and projections*** *prepared by management of Oncternal relating to Oncternal's prospects.*

Proxy at 147. Nonetheless, the Proxy fails to disclose **any** of the financial projections for GTx and/or Oncternal.

33.     Simply put, management projections are clearly material to stockholders when deciding whether to vote for a merger. This is especially so where, as here, such projections are necessary for shareholders to assess the value of the consideration they have been offered in exchange for their stake in GTx (22.5% of the outstanding shares of common stock of the combined company) at a time when the Company is trading at its all-time historical low. The complete omission of the projections for GTx and Oncternal renders the statements throughout the Proxy that the Merger Consideration is "fair" to the Company's shareholders incomplete and misleading.

34.     *Second*, the Proxy omits material information concerning the sales process leading up to the Proposed Transaction. Specifically, the *Background of the Merger* section of

the Proxy indicates that GTx entered into confidentiality agreements with many interested parties, including Company A, Company C, Company D, Company E, Company F, Company G, Company H, Company I, Company J, Company K, and Company L, and Company M. *See* Proxy 124-38. However, the Proxy fails to disclose whether any of these twelve confidentiality agreements, or any others that may have been entered into, contained a standstill provision and/or a "Don't-Ask-Don't-Waive" ("DADW") provision, and whether any such provisions remain in effect.   Such information is plainly material, as any reasonable stockholder would want to know whether parties that had previously expressed interest in a potential merger with the Company are now foreclosed from submitting superior proposals. The omission of the aforementioned information renders the statements in the *Background of the Merger* section of the Proxy false and/or misleading.

35.     *Third*, the Proxy fails to disclose the nature and circumstances surrounding the negotiation of post-close opportunities and continuing employment, including those that were ultimately secured for members of the Board. Specifically, the Proxy discloses that, upon consummation of the Merger, defendants Michael G. Carter and Robert J. Wills will be appointed to the Board and Mr. Carter and Mr. Wills will then have authority to appoint no less than four directors to the combined company.

36.     Plainly, these interests conflict with those of GTx's non-insider stockholders, and by failing to disclose any and all information regarding the negotiation of this continuing employment, GTx shareholders are unable to fairly evaluate the extent to which they tainted the process leading up to the Merger Agreement. Put simply, a reasonable stockholder would want to know whether and to what extent a member of the Board negotiated for their own interests ahead of the best interests of the Company's shareholders. This is especially so where the Board

evaluated and ultimately rejected multiple other offers that may have led to no personal benefits for its members. This is also all the more true in light of the fact that GTx management and the Board were reportedly concerned that "any merger with a private company presented difficult corporate structuring issues for a public company and the proposals that had been suggested so far would result in significant dilution for GTx's stockholders," but nonetheless entered into exactly such a transaction with Oncternal. Proxy at 127. By failing to disclose such information, the disclosures in the *Background of the Merger*, *Interests of GTx Directors and Executive Officers in the Merger*, and *Management Prior to and Following the Merger* sections of the Proxy are rendered materially incomplete and misleading.

37.     *Finally*, during negotiations, other bidders (including Parties L and M) provided actual bids to GTx, but the Proxy does not disclose the terms of those bids. It is well-settled that other, competing bids must be disclosed, so that shareholders can know what other options were on the table. This is again all the more true in light of the facts that (1) the Board evaluated and ultimately rejected multiple other offers that may have led to no personal benefits for its members and (2) GTx management and the Board were reportedly concerned that "any merger with a private company presented difficult corporate structuring issues for a public company and the proposals that had been suggested so far would result in significant dilution for GTx's stockholders," but nonetheless entered into exactly such a transaction with Oncternal. By failing to disclose such information, the disclosures in the *Background of the Merger*, *Interests of GTx Directors and Executive Officers in the Merger*, and *Management Prior to and Following the Merger* sections of the Proxy are rendered materially incomplete and misleading.

38.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent

disclosure of the foregoing material information prior to the special shareholder meeting to vote

on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make

a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and

they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**On Behalf of Plaintiff and the Class Against
GTX and the Individual Defendants for Violations of Section 14(a)
of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder**

39.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

40.     Defendants have issued the Proxy with the intention of soliciting stockholder

support for the Proposed Transaction. Each of the Defendants reviewed and/or authorized the

dissemination of the Proxy, which fails to provide critical information regarding, among other

things, the process that led to the Proposed Transaction and projections relied upon by Aquilo

and the Board in deciding that the Proposed Transaction was fair.

41.     In so doing, Defendants made untrue statements of fact and omitted state material

facts necessary to make the statements made not misleading. Each of the Individual Defendants,

by virtue of their roles as officers and/or directors, were aware of the omitted information but

failed to disclose such information, in violation of Section 14(a).

42.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of

the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any
> 14D9 statement, form of 14D9, notice of meeting or other communication,
> written or oral, containing any statement which, at the time and in light of
> the circumstances under which it is made, is false or misleading with
> respect to any material fact, or which omits to state any material fact
> necessary in order to make the statements therein not false or misleading or

necessary to correct any statement in any earlier communication with respect to the solicitation of a 14D9 for the same meeting or subject matter which has become false or misleading.

43.     During the relevant period, Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

44.     Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning certain material information regarding the projections used by Aquilo and the Board in deciding that the Proposed Transaction was in the best interests of the Company and its shareholders, the process leading up to the consummation of the Merger Agreement, and the conflicts of interest facing members of the Board.

45.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Board, GTx management, GTx's outside legal counsel, and Aquilo all reviewed and assessed financial projections for GTx, and further states that the Board considered the fairness opinion provided by Aquilo and the assumptions made and matters considered in connection therewith, which included financial projections for GTx and Oncternal. In addition, the individual Defendants were privy to and had knowledge of the projections for the Company and Oncternal and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or should have known that the material information identified above

has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

46.     The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

47.     By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

48.     Unless Defendants are enjoined by the Court, they will continue to breach their duties owed to Plaintiff and the members of the Class, to the irreparable harm of the members of the Class.

49.     Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

## <u>COUNT II</u>

**On Behalf of Plaintiff and the Class Against the Individual Defendants
for Violations of Section 20(a) of the Securities Exchange Act of 1934**

50.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

51.     The Individual Defendants acted as controlling persons of GTx within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of GTx, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in

the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

52.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

53.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

54.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

55.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

56.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons,

these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

57. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict. Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B. Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D. Directing Defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

E. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: May 7, 2019, 2019          **MONTEVERDE & ASSOCIATES PC**

                                     By: */s/ Juan E. Monteverde*
                                           Juan E. Monteverde (JM-8169)
                                         The Empire State Building 350 Fifth
                                         Avenue, Suite 4405 New York, NY 10118
                                         Tel:(212) 971-1341
                                         Fax:(212) 202-7880
                                         Email: jmonteverde@monteverdelaw.com

                                         *Attorneys for Plaintiff*


**OF COUNSEL:**

**KAHN SWICK & FOTI, LLC**
Michael J. Palestina, Esq.
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Tel.: (504) 455-1400
Fax: (504) 455-1498
E-mail: Michael.Palestina@ksfcounsel.com


*Attorneys for Plaintiff*